Case number 241375, Nancy Hooks v. City of Warren, MI at all. Oral arguments not to exceed 15 minutes per side. Ms. Badalamenti, you may proceed for the appellant. Good morning, your honors. May it please the court. Rachel Badalamenti here for the defendant's appellants. There are four of them. Four police officers, Doe, Monofo, Brown, and Gianola are left in the case. Counselor, are you reserving time for rebuttal? That's fine. I am. Five minutes, please. So I would like to begin with the two sort of what I call the easier issues. The first is the unlawful arrest claim. There are two officers who are left as party defendants to an unlawful arrest under 42 U.S.C. 1983. Let me go back just a step here. In reading all the both the complaint in the lower court briefing and now your briefing here, it's not clear, at least to me, what are the federal claims and the state claims? You seem to be saying the excessive force and the unlawful arrest are the federal claims, the 1983 claims. Everything else are state claims. Yes. Is that your theory? As pled the malicious prosecution, no, sorry, as pled the malicious prosecution is a federal claim. It was pled. So you say you have three federal claims? Three federal claims. That is my understanding of how it was pled. I don't think that the standards for malicious prosecution change, though, dynamically between state law and federal law. I guess I would disagree with both of those things, that A, that that's how it was pled, because in the complaint it cites state law, the malicious prosecution claim does. And then two, I guess I'm not convinced that there isn't a real difference between a state and a federal take on malicious prosecution. But go ahead. So I can address malicious prosecution first, if that helps. So that was one of the first two claims I was going to address. Anyways, this claim is left open as to Menompho, Brown, Giannola, and Doe. I believe under state and federal law, the dispositive question is whether or not they participated in the initiation of a criminal proceeding against Ms. Hux. And so for that reason, I think that the analysis should be the same. Now, there are different elements that I don't think come into play for dispositive purposes under summary judgment. Under both federal and state law, importantly, subjective intent, motivation of the officers, all that doesn't come into play in either state or federal law regarding analysis of a malicious prosecution claim. The question is whether or not they initiated. Here, it is very clear that they did not initiate. A prosecutor did. And in fact, in this situation, and I think it's really important, the officer defendants are twice removed. Because once they get back to the station, only one of the four defendants left open in this claim actually even authors a written report regarding the encounter and the arrest of Ms. Hux. That's Officer Menompho. The other three don't even write a written report. They are just arresting officers. Once they get back to the station, they write their report, give the file over, and an officer in charge, which in the City of Warren Police Department means someone from the detective bureau takes over the file. And that person, that officer in charge, who in this case, the record, you'll see it at Record Exhibit 36-5. You'll see it at Exhibit 36-4. The complaining witness is Officer in Charge Gurecki, G-U-R-E-C-K-I. Officer Gurecki is the one that submits the paperwork to the prosecuting attorney who makes the prosecutorial decision. So here you have some theory that these officers initiated a prosecution or, because under federal law, you can have an analysis of whether there was a material falsehood that contributed, right? Counsel, I appreciate all of that on that specific claim, but I think I'm also struggling like Judge McKee with just some basic framing questions. So as I understand it, you have identified excessive force, unlawful arrest, and malicious prosecution as the federal claims, and then battery and I-I-E-D, as I call it, as the state claims. Yes. Okay. And so let me, let me just, let me start with jurisdiction, because I think under, for these federal claims, unlawful arrest, excessive force, and you're saying malicious prosecution, correct me if I'm wrong, in a qualified immunity appeal, you have to essentially concede the facts. Correct. Do you concede the facts? We do. Okay. We concede them under the video evidence and under Ms. Hook's testimony, yes. Okay. So the district court says, in its order, Hooks complies and begins quickly walking away south down Lorraine to her truck. Yes. You concede that she was complying. I concede that initially she, she complied when Officer Giannola was walking behind her. That is true, that does happen. However, she then turns around, so that precedes the actual arrest. So what, what actually occurs here is Ms. Hooks is instructed to go, go. Right. She's told, I think she testified seven times, so I accept seven instead of 12, as shown in the video, and we argued 12 times on the video, she was told to go home and leave the scene. Seven times. We'll take her testimony. She admits she walked away, and you can see Officer Giannola, a smaller officer, walk behind her as she walks away. She walks towards her truck, which she testified is parked near the fire truck. She then, and what judge, what the lower court judge didn't recognize, is that she then turns around. That's the turnaround. So you see the struggle that we are going to have here in a jurisdictional sense is when you say District Judge failed to recognize this particular factual fact or factual inference that we're wanting to draw, that deprives us of jurisdiction because we can only consider a legal question here. So I don't think it does, and the reason is because it is, it is a basis for qualified immunity under the law, and it's a basis for jurisdictional analysis by this court, where there is video record and the undisputed plaintiff's testimony, and the trial court simply ignored it. And we cite this extensively in our brief. So, in other words, if the district court took pieces of the video evidence, but found material questions of facts based on argument of attorneys, instead of what the actual record says, which is what happened here. I don't see how you can say that he ignored it. He specifically discussed where he says there are factual disputes that can't be resolved by the video. If it's not mentioned at all in his opinion, then I would understand your argument. But he specifically discussed where he believes there are factual disputes that have to go to a jury. What you're arguing about is you don't like his answer, or you don't like the inferences he drew from that. So then we go ahead and look at the video, and the police say that it was a controlled or chaotic scene. I would have to tell you, looking at the video many times, I don't see it being controlled or chaotic. And there's a dispute about whether she was yelling. You can't tell from that whether she was yelling. You can hear sounds, but you don't know that it's coming from her or what she's yelling. Then there's this dispute about whether she was disobedient when he calls her a white trash bitch. I mean, she was not happy with that. She turned around and she said she's going to call the sergeant. But then the testimony is that there wasn't any hindering that arose out of any of these things that she did. So I'm just giving you some examples. There are several more examples where the police say that the video is clear and undisputable. And we've looked at it. It's just not true. So what do we do with that in terms of whether we have jurisdiction? Yes. So the important piece of what you just said is that there are facts that are shown in the video that were in fact ignored by the district court. For example, whether or not Ms. Hooks is yelling is demonstrated in the video. And to be sure that it's demonstrated in the video, we attach a transcript of the video. The only transcript that exists, we attach it. It is part of the lower court record. It identifies Ms. Hooks yelling. She's calling the officers foul names. She is inciting the crowd that's to the left of the officers by asking, who wants to go with me? We should all call the supervisors. She is doing those things. And the district court ignored them. Specifically at 19.46.01 to 07.02, Ms. Hooks walks over to the crowd. She says, anyone else want to call the sergeant on them? The crowd then starts screaming at the officers at 19.46.21. It does incite the crowd. The crowd then starts screaming at the officers and a lot of screaming ensues. And you're right. Then you can't tell if Ms. Hooks... prepared the transcript. I have it marked somewhere. Bottom line is your complaint is that Berg disregarded the transcript. That he disregarded the transcript. He disregarded the points in the video that are dispositive. In other words, he took and accepted the video as you review it. And our second site, he'll look at 19.46.21.24 where Officer Gianola walks behind Ms. Hooks and she seems to be walking to her car. He then rules she seems to be complying at the time of her arrest. What's wrong with that is that at 19.46.24, she turns around, she comes back towards the police officers. She's then standing in the middle of Ford Street. She admits this in her testimony. That's my other problem with the lower court opinion. Let me stop you right there. We're not fact finders here at this level, but I've looked at that video and gone back and had it replayed for me several times. And it's certainly not to be as charitable to the police as possible. I would say that it's certainly not clear that she stopped and she turned around and that she assumed this fighting stance. Maybe a jury would see that, but I didn't see that. That's what you guys say the video shows. Hooks says the video shows something different. I don't see where you accept Hooks' version of this. Yes. So with respect to her actual arrest, the encounter, the takedown, the excessive force claim, which I wasn't there yet, Ms. Hooks does testify to that. The trial court doesn't even dispute it and plaintiff even in its appeal brief doesn't. She does testify to her fighting stance. She does testify that she cocked up her arms up over her shoulder. She testifies to all of that in her deposition testimony. So if police come up from the side, which is what appears to have happened here, and grab her, that's all we can see from the tape. And there is a reaction, however you want to characterize it, to then say that it's undisputed that that reaction was in fact a fighting stance from this 150-pound woman, older woman with two police officers standing next to her. I'm not startling her and grabbing her. I just don't get it. It was only one police officer that she encountered. Also, she admitted in her deposition testimony, while she initially testified, another area where Judge Berg erred, well she initially testified that she was walking backwards and she encountered the officer on the side. In fact, she testified later in her deposition, specifically at pages 155 and 156 and 207 to 210, that actually she was walking straight forward. She saw Doe come in front of her, accost her, and she is facing him at the time. And so these are the portions of the record that were just disregarded by the trial court, is we've accepted her initial testimony, and then when she's actually reviewing the video and refreshing her recollection, she testifies to the facts. In fact, she testified that she lifted her arms up over her shoulders. And when I asked her why did she do that, her testimony is, it was my reaction to him. Not that she was startled, it was her reaction to him. Now, very importantly... I'm missing the difference there. Yes, so the distinction is that there are cases like Marvin versus City of Taylor, and there are cases out there like Redloff and Stanfield that recognize that even where there is a startled reaction by somebody who's having a diabetic attack, that the police officers, and in Marvin he was very highly intoxicated and had a diminished mental capacity, the officers don't know that at the time. All that they can perceive under these cases for the clearly established standard for qualified immunity is they have to think, am I within the law to do what I'm doing, right? It has to be reasonableness. How much time do you think that the tapes show elapsed from the time that the one officer put his hand on her to the time that either that officer or the other officer took her to the ground? How much time elapsed? It is four seconds. So he was holding her for four seconds before he takes her to the ground? No, the whole encounter, she's back up on her feet within six seconds. So it is a split second. It is, she is, he takes her arm, she pulls up, she takes a fighting stance with her arms above her shoulders as she admits when she's watching the video and we did a still frame so that she could see her fighting stance. At that point, she is taken to the ground immediately and it is a total of six seconds before she is up on her feet. So when we say split second, I mean it is literally, she took that stance, he took her down. And he has to because the scene... So the answer to my question is a split second. A split second. Okay, that's what I wanted. And it had to be that way at this scene because as you, well it is not chaotic at all points in the video. There is no dispute and Ms. Hooks acknowledges that both before and after her arrest there were still fights breaking out all over the place and you can hear it. Actually an officer is being beaten in the front yard as she's being walked to the... I saw no fights on the video. Are you saying the video showed fights? The video of these officers, you can hear the fight happening. I'm asking you, does the video show fights? I know that there is video in the record. I don't think the video submitted to this court actually shows the officer being beaten in the front yard. Okay. If it happened after her arrest. But you can certainly still hear it. You can hear it and you can hear the officers radioing on the video submitted to this court. The officer Brown, you can hear the dispatch radio. They are communicating an officer in distress in the front yard and everybody is running over there. Counsel, we are over time but you're going to have your full rebuttal. Thank you. No, thank you. Good morning. May it please the court. Nina Krakus to wheel on behalf of Mrs. Hooks. I guess I wanted to point to the fact that Judge Berg was very troubled by this entire incident, given what he stated in his opinion. I believe he said something to the effect that the standard that American citizens expect from police officers was not on display that day and it was just the exact opposite. To your point, when you were asking about what was happening with the crowd and opposing counsel brought up how there was yelling, I think what you have to remember is that the officers were cursing at the people who were standing there. Once you hear them cursing at them, that's when you hear the crowd start yelling. It wasn't because Ms. Hooks was inciting them to do anything. He's telling them to shut the F up, get the F out of the street, and they start yelling and getting more agitated. Those same police officers, when they were deposed and at the trial even, admitted that that type of language did the exact opposite of what they were intending to do at that scene, which was to calm everybody down. It actually incited the crowd. To say that Ms. Hooks was the one inciting them is not true. All of the officers that testified either at the trial or at their deposition said that she didn't hinder them from arresting anyone, didn't hinder them from doing their jobs, that even after being called a white trash bitch that she was agitated, but that she didn't even start yelling after that. I think the other major issue is that Officer Brown, who is the officer who ordered her to be arrested using this language that no one would understand means you're under arrest, basically admitted at his deposition and at trial that she was walking away when she was arrested. She was definitely trying to comply. She was walking backwards. She had her phone out because she said she was filming another assault that she believed was taking place against a pregnant woman. Let me just stop at that moment. I have a few questions here, but one of which is this whole notion of whether she was complying, which Judge Berg wrote in the opinion. I think that's a factual finding, and I think we could defer to that factual finding that at the moment that this encounter that we were discussing happened, when the arm comes up, that kind of thing, and she's taken to the ground, she was complying. Is it possible to say that in the moments before that she had been told to leave and was not complying? She was told to leave, but they're on a public street, and she's standing there, and there's nothing going on really that I guess I would consider to be the fights that they attached as part of the record that were being the videos that you actually have of that were well before Officer Brown pulls up in his car and you see that dispatch video. So yes, she admitted that they told her to leave, but she was not committing a crime. They had no reason to believe that she was committing a crime. Is it a crime to fail to obey a police officer? Well, I would say under that municipal code, which is vague, it says that you, and I'll tell you. Hold on, but that doesn't make a difference as to whether or not. I mean, if there's probable cause for a crime, they can arrest her. Right. Right? Correct. And even for a municipal code violation or a failure to obey.  But I would submit here that she did not. They had no reason to suspect that she had even committed a crime because that command in and of itself to just tell her to either leave or go walk away I think was not the kind of command that someone would expect. It is like a part of criminal conduct, I guess is what I'm saying. And she's filming out there and there's case law that says filming the police, there's nothing wrong with that. The officers admit that you can do that on a public street you're filming. So I don't agree that they had probable cause to arrest her for several reasons. But first and foremost is that they didn't suspect her of committing a crime. I'm sorry. No, go ahead. No, please. I was going to pivot. No, go ahead. No. I'm going to pivot. And if you want to pivot back, Judge Cole. But the pivot is to this malicious prosecution claim and trying to, again, identify which of these are state claims and which are federal claims. Was the malicious prosecution claim a state or federal claim? It was a state claim as it was pled in our complaint. Okay. And you would stand by that today? Yes. Okay. We cited the jury instruction, I believe, the Michigan jury instruction for that. And I believe it's clear that that's the case. I just wanted to get to the issue, a pretty discreet point but an important one, I think, of the extent to which she has testified, Ms. Hooks, that she complied. So records seem to show that the officers asked her to leave a number of times and that she did not, maybe as many as six times, whatever the number might be. But I understand Ms. Hooks' testimony to be that at some point she did comply, that she was complying and she was actually leaving the scene. Yes. I mean, is that correct? So maybe didn't comply initially, but at some point in time in that whole between second one and the four-minute end, she was complying in her mind, in her testimony, and was leaving the scene. Yes, backing away, going towards her truck. And that's where I think the issue is when she testified at her deposition, she did not agree to the number of times that counsel said she was told to leave. I believe she said a couple of times. And so whether it was 12 times or not, Ms. Hooks is hard of hearing. That could have been one reason why. Maybe she didn't hear it. I don't know. Maybe it wasn't clear. They were outside. There were still some people there. But, yes, she admitted that they told her to leave a couple of times. But the entire encounter from the time Officer Brown pulls up in his scout car and the camera is on to the time that she's taken to the ground is less than four minutes. What's the impact of the language you referred to earlier? I guess it's basically she can go, something to that effect. So Judge Berg, when analyzing it and also during just the depositions and the trial testimony, found that language to be very confusing because Judge Berg interpreted it as, or he said one interpretation by a jury could be that when Officer Brown said if she doesn't leave or she can go, that the jury could think that the two officers, instead of taking her down and arresting her, should have allowed her to leave. Because that was just like a police phrase known to the officers but not known to anybody else what she can go means. I mean, to a reasonable person, a reasonable juror, that might mean that they should have just let her go. So that phrase or the different phrasing that they used was not clear. And they also said that they were standing a significant distance away from her when that order was given. But Judge Berg felt like that was a very confusing command. And we agree with that because I would not know what that means if I heard that. And I think that's fair. And I also, with the jurisdictional issue, I agree that I feel like it's very hard to stand here and say that, yes, I stipulate to all of the facts, but then you're still contesting what the video shows. When Judge Berg clearly said some things appeared clear and some things were not. And because you have that dispute, a jury has to be the arbiter of those facts. Well, what about her argument that, ignoring the video for just a second, that he did ignore the transcript of the sound that's going on? Because I don't think he discussed that in his opinion. Yes. And I think the transcript wouldn't really, I don't think it would add anything else. Because let's assume that Ms. Hooks really was on there saying, who wants to call their sergeant with me? Or, you know, let's call their sergeant. None of the officers ever said that she actually incited the crowd to do anything. And she was probably agitated. And they agreed that she had every right to be after being called a white trash bitch. So I think that no matter what phrasing or what things are kind of put in the transcript that were gleaned from that video, the bottom line is that you can watch it. You can watch it in real time, basically the pertinent part of the incident, which is the part from when Doe arrives on the scene until the time that she's, or Officer Brown, and then until the time she's taken down. And that video, we're lucky that a bystander actually is the one that filmed the video that shows the actual encounter with the police and not the scout car video. Because the scout car video is just pointing at them, and that shows her initially talking to them and telling them that she saw somebody get beaten up and that sort of thing. She's obscured in a lot of the scout camera video. You can kind of pick out which one is her by the color of her top. There are people between the car and her in that particular video. Yes, but you can see her off to the side talking to who we now know as Officer Gianola because he was the one who was upset with her at some point and called her that name and just said it was unfortunate that she heard it. But you can see her speaking with them and trying to tell them, you know, I saw this boy on the ground, the kids who did this or the people who did this went that way, and trying to give them a description. And they weren't happy about the lack of specificity in her description, but there's no doubt that she was trying to help because she saw this kid get beaten up. But the Facebook video, which is Exhibit 12, was shot by a bystander, and that shows the significant interaction for this case. Let me ask you, counsel, jurisdictionally, and I really appreciate you kind of helping me put these claims into the right bucket and understand your argument about the federal claims, excessive force and unlawful arrest, that if they're disputing the facts, then there's no jurisdiction. On the state claims, malicious prosecution, intentional infliction of emotional distress, there's no immunity question here. That's not how this was decided, and I don't think that would apply because they're state claims. So the only way we would exercise jurisdiction because they are, I think, pendent jurisdiction, it's inextricably intertwined with the other claims. Is your argument that we should exercise jurisdiction and affirm on the merits or that we should not exercise jurisdiction? Well, I feel that the jurisdiction issue is important because they have not met the standard for the court to, I believe, to hear the case, just based on their dispute with the facts. But, you know, I believe that Judge Berg got it right, and obviously we would be happy if you affirmed the decision. But I also think that, you know, with the jurisdiction on the state claims, I mean, you also have the right to not exercise pendent jurisdiction over claims. It's just that you have the discretion to do that if you choose to. Do you see them as all intertwined? So I think the question of probable cause, that determination, obviously it resides in all of the claims in some way. Because except for the, well, I guess even the emotional distress claim, depending on what's held, it could be found that, you know, there's case law that says if there was probable cause and there's really, you can't say that their actions were not reasonable, so, you know, it doesn't really help the emotional distress claim. So I think it's fair to say the probable cause issue is what binds the claims together. I'm not going to, you know, pretend like that's not the case. Yes. I have a little bit of time left, but I'm not just going to waste it. There's to use if you would like. I think that you have focused on all of the pertinent issues. I won't have a chance to get back up here again, but I do think that Judge Berg painstakingly went through the exhibits and the record and was honest about what was clear and what wasn't in order to, in issuing his opinion. And I believe that it's very clear that there's a question of fact, just because we are debating all of these things that either did happen or didn't happen based on that video and all of the testimony that has come in. So thank you. Thank you, counsel. Okay. So I want to start first by pointing out that transcript. It was separately filed to accompany the motion for summary judgment in the lower court. It is at the record number 39. I secondarily want to point out that when we're looking at whether or not qualified immunity, this court jurisdictionally has the ability to review the challenge to the unlawful arrest and other claims. The question of probable cause for the arrest, as I heard it from, and as I read it in the briefs and as I heard it from counsel, the question is whether she understood the direction she can go. And Judge Cole, you asked a question about was she attempting to comply. That comes right from Judge Berg's opinion. He concluded she was attempting to comply in determining what set of case law should be applied in the case. The reality is that Ms. Hook's own testimony confirms that she knew at that point she was being arrested. She knew Brown was behind her. Officer Brown was behind her to effectuate her arrest. You cannot engage in criminal activity and then say, okay, fine, now that you've said that you're going to arrest me, now I'm going to go walk to my car. A decision to arrest had unquestionably, unequivocally, every officer testified at that point in time after she had been given command after command and you see Officer Brown walk behind her across the street and you hear she can go, that at that point a decision to arrest has been made. She's aware of it. She hears it. He points right at her and says, you're going, and it's in the transcript. Now, at that point in time, the question is, is she attempting to comply? There's nothing to comply with. She's under arrest. And so that is the error and that is the break in the analysis in Judge Berg's opinion is that he's conflating one set of facts and admissions with what actually happens according to the video record. There are a number of cases, although I would concede I don't think they're probably really clear, about whether the police actually have a duty to warn somebody about what's going to happen. And if we assume for a second that they do, your position would be she can go, is sufficient notice to her that she's in the process of being arrested? Either that it's sufficient notice to her or that it combined with Officer Brown behind her and Officer Doe being encountered in front of her, that she knows she's under arrest at that point. She's refused to follow command. She's been told multiple times she's going to go to jail. They are trying to clear the scene. So you're saying that because there's a police officer on each side of her that her ability then to leave is sufficiently restricted that she's under arrest, even before the hands are put on her? Yes. I think that it is impossible from that video record for any reasonable juror to conclude that she did not understand at that point a decision had been made that she was under arrest. And I say that because not only do we... Even though you say all of this occurred within four seconds. No, within four minutes. Or minutes. Within four minutes. Within six seconds. She encounters Officer Doe who, remember, Officer Doe does not know why Ms. Hooks is under arrest. He does not know if she's brandished a gun. She does not know anything. He was not around Ms. Hooks as the other encounter with our bad-mouthed officer. He's not around. So he only makes the arrest because Officer Brown tells him she's under arrest. She's four feet in front of him at the time that he says she's under arrest to the other officer. But he didn't say she's under arrest. No, Officer Brown does. Officer Brown testified, and it's undisputed, that he says to Officer Doe, that's the only reason Officer Doe turns around to stop Ms. Hooks. Officer Doe is not part of the group that Ms. Hooks was involved with earlier. That's what's really important is that when we say she's attempting to comply and when the court applies the lawly set of cases on attempting to comply, that's not where we are. We are in effectuating an arrest at that point, and we are dealing with Officer Doe who had no previous encounter with Ms. Hooks. You're saying that independent of this exchange about she can go, the record establishes that a police officer said she's under arrest or arrest her and that she heard that and she understood that. That Officer Brown testified that he's the one that gave that. He was right behind Ms. Hooks. He's right on her tail. He's following behind her, and he tells Officer Doe she's going, arrest her. Officer Doe turns around. He does that. That's the undisputed record. I'm focusing in on the arrest her. That's in the record. Yes. A direction to a police to arrest her that she heard, because I don't remember seeing that anywhere. Yeah, I don't think he used the word arrest. Well, let's not make up things. So what he said to her is, take her, she's going. That's what Officer Brown testified. I thought that the record shows that they said she can go. That's what they said. When she says that she heard it, she's still in the roadway. Officer Brown is coming up behind her, and Officer Giannola says she can go. That's what she hears. Separately, separately, and this is why a frame-by-frame analysis is so critical, because you have to apply the exact case law here, not lawly cases that deal with people in booking that have already been searched. You have to apply the actual facts to those moments of arrest, because you have Doe who's not involved in all the preceding stuff. And so those moments of arrest are critical. So we have then Brown give Doe a directive that she's going, take her. And Doe turns around at that point, and Doe effectuates the arrest. And so while that other stuff is important to the probable cause analysis. So you're saying that they said she, she. . . Take her. All right. And you're saying that's corroborated by this record? Yes, by Officer Brown. All right. And so Officer Brown and Officer. . . So Brown says that he says that? Yes. Does she concede that? Does she admit that she was. . . She says she doesn't recall. Okay. So her testimony, she can't recall any of those events. In fact, her recall in the beginning of her deposition is completely opposite. And she concedes she really has no recollection. When she actually watches the video, she admits throughout her deposition it's wholly contrary to the way that she remembered the incident. Do you have before you the record site where Officer Brown says, uses the word arrest or take? What I have here in my notes is that Officer Brown says, if she wants to move, if she doesn't leave, she can go. And I'm not seeing the word take or arrest. So let me make sure. . . Maybe you can cite me. . . Or I can find it if you don't have it before you. I do not have it, but I know that his deposition transcript was attached to the corrected summary judgment brief at Exhibit 38, so it's one of the exhibits there. But I don't have the exact site to his language. I will concede that that portion, that you do not hear what Brown says to Doe in those moments, but that distinction of the officers who are involved, where we only have a few officers on each separate claim, that it's very important that this Court and that Judge Berg, if he's going to keep Officer Doe in on an excessive force claim, that it's what Officer Doe knew in those moments, and what Officer Doe did that constitutes excessive force, not what happened all preceding that. So this exchange that we're pursuing with you right now, that's not captured in the transcript? It's not captured in Exhibit 39 transcript. It is not. Okay. Now, one other question I want to ask you is, this all starts out because the Supreme Court quite some years ago said that they watched a video of a high-speed chase. The justices themselves watched the video, which was something really new and different for all of us. And they basically said that you don't have to accept what a plaintiff says if it's, and I don't remember the exact phrase, but clearly and unequivocally refuted by something like a video. We've now morphed from that, and this is what I want your reaction to, to basically what you've said repeatedly today is a frame-by-frame analysis, accompanied by a court reporter transcript, that you think then provides jurisdiction. And I'm just wondering if you have any case law that would guide us in trying to apply what the Supreme Court told us was the rule and what you're now arguing we should apply as a rule. So, I don't have any case law for that, but I do want to point the court to a very recent decision that is going to come up to this court, where I think that exact issue is going to be the question, and that is Grady v. Kranzenberg. It's 2025 West Law 747878. This case was just decided about a month ago. And I think you're going to have this exact question, because in this case, where the facts are really closely aligned to our case, you have a takedown maneuver, and you have a frame-by-frame analysis of the actual events out at that scene. And in some instances, you can't see specifically where the plaintiffs were versus where the officers are. But the ultimate conclusion of the trial court is, with respect to the unlawful arrest and the probable cause standard, that the fact that we hear the officers, and we have a transcript that says the officers told them to back up, and they refused, they failed to follow that command when it was given five times in that case, that that's sufficient for probable cause, even if you don't do the frame-by-frame analysis. And then with respect to the excessive force claim in that Grady case, that you could not see exactly what's going on. We'll look at this decision. Okay. This is not binding on us. Yeah, but I think the answer to your question is, that is the argument being made in all these cases, and that is the best case I can point you to is Wysong. The Wysong case does say and does do that frame-by-frame analysis in order to make its decision, and sort of expands on what the Scott versus Harris case did. And so there are a series of cases that are cited in Wysong, too, that I think might help clarify exactly what the burden is with respect to these videos. Thank you. Thank you. Counsel, thank you both for your excellent arguments. A really interesting case. The case will be submitted, and we have no further cases, so the clerk may adjourn court.